IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA23-559

Filed 4 June 2024

Wake County, No. 20 CVD 9574

JUDI BADER SUNSHINE, Plaintiff,

v.

IAN SUNSHINE, Defendant.

Appeal by Plaintiff from orders entered 3 August and 23 November 2022 by Judge Rashad Hauter in Wake County District Court. Heard in the Court of Appeals 7 February 2024.

*Tharrington Smith, LLP, by Jeffrey R. Russell, Evan B. Horwitz, and Casey C. Fidler, for Plaintiff-Appellant.*

*Jackson Family Law, by Jill Schnabel Jackson, for Defendant-Appellee.*

COLLINS, Judge.

Plaintiff appeals from an order granting her alimony and a subsequent order denying her motion for a new trial. Plaintiff argues that the trial court made several errors resulting in an insufficient alimony award. For the reasons stated herein, we vacate the order granting alimony and remand for further findings of fact, conclusions of law supported by those findings, and a proper determination of the amount of alimony in accordance with those findings and conclusions.

## I.    Background

Judi Bader Sunshine ("Plaintiff") and Ian Sunshine ("Defendant") were married on 3 June 2000 and separated on or about 7 March 2020.  Two children were born of the marriage, both of whom had reached the age of majority before entry of the challenged alimony order.

Defendant has been in the packaging supply business for more than twenty-seven years and is the sole owner of Sun Pro Packaging, Inc.  Plaintiff became a stay-at-home mother in 2001, around the time that the parties' first child was born, and she did not return to work outside the home until 2016.  She is employed part-time as a teaching assistant for special needs children at Quest Academy and she owns Wingin' It, a business that sells butterfly farming supplies.

Plaintiff commenced this action on 31 August 2020 by filing a complaint for child custody, child support, postseparation support, alimony, equitable distribution, and attorney's fees.  Defendant filed an answer and counterclaims for child custody and equitable distribution.  Plaintiff  filed a reply to Defendant's counterclaims and affirmative defenses.

A hearing on Plaintiff's claims for postseparation support, child support, and attorney's fees was held, and an order was entered on 11 January 2021 ("PSS and Child Support Order").  The trial court found that Defendant had reasonable monthly expenses of approximately $16,000 and a monthly net income of $38,000, and that Plaintiff had reasonable monthly expenses of $9,859 and a monthly gross income of

$1,000. The trial court further found that Plaintiff is a dependent spouse who is actually substantially dependent upon Defendant for her maintenance and support and awarded her $6,859 per month in postseparation support for thirty-six months or until entry of an alimony order. The trial court awarded Plaintiff $2,000 per month in child support until the parties' remaining minor child graduated from high school approximately five months after entry of the PSS and Child Support Order. The trial court further found that Plaintiff was entitled to reimbursement from Defendant for her attorney's fees.

On 29 September 2021, the trial court entered a Consent Equitable Distribution Judgment and Order. Defendant was distributed the following property: the marital residence and the parties' lake house with the mortgage notes upon each; three cars; a boat; two jet skis; investment accounts with a value of approximately $614,609; Defendant's IRA; 66% of profits from a deferred profit plan and the tax liability thereon; Sun Pro Packaging, Inc.; and various items of personal property. Plaintiff was distributed the following: a cash award of $475,000 associated with the parties' marital residence and lake house that Defendant received; two cars; investment accounts with a value of approximately $614,609; Plaintiff's IRA; 34% of profits from Defendant's deferred profit plan; Wingin' It; and various items of personal property.

Plaintiff's alimony claim was heard on 14 March 2022. On 8 April 2022, the trial court orally rendered preliminary findings of fact and announced that it was

awarding Plaintiff alimony in the amount of $6,500 per month for 120 months. Counsel for the parties submitted supplemental written closing arguments and draft orders to the trial court after its oral ruling.

The written order ("Alimony Order") was entered on 3 August 2022. The trial court found that Defendant's net monthly income was $25,473.58 and reasonable monthly living expenses were $11,788.39, leaving him a monthly surplus of $13,685.19. The trial court found that Plaintiff's net monthly income was $3,419.84 and reasonable monthly living expenses were $5,932.68, leaving her a monthly shortfall of $2,512.84. The trial court awarded Plaintiff alimony in the amount of $2,513 for 120 months.

Plaintiff moved for a new trial or alteration of the Alimony Order. The trial court entered an order on 23 November 2022 denying Plaintiff's motion. Plaintiff timely filed a notice of appeal from the Alimony Order and the order denying her motion for a new trial.

## II.    Discussion

Plaintiff sets forth the following issues on appeal, arguing that the trial court erred by: (1) awarding an insufficient amount of alimony to Plaintiff; (2) failing to find and conclude that Defendant engaged in other marital misconduct; and (3) making certain findings of fact and conclusions of law. Plaintiff essentially argues that the trial court made certain factual and legal errors that led to an insufficient alimony award.

We note that although Plaintiff noticed appeal from the trial court's order denying her motion for a new trial, Plaintiff made no argument to this Court that that trial court erred by denying that motion. Any argument that the trial court erred by denying the motion for a new trial is deemed abandoned. *See* N.C. R. App. P. 28(a).

## A. Standard of Review

"As our statutes outline, alimony is comprised of two separate inquiries." *Barrett v. Barrett*, 140 N.C. App. 369, 371, 536 S.E.2d 642, 644 (2000). "The trial court's first determination as to whether a party is entitled to alimony is reviewed de novo." *Madar v. Madar*, 275 N.C. App. 600, 604, 853 S.E.2d 916, 921 (2020) (italics omitted). "If the trial court determines that a party is entitled to alimony, then a second determination is made as to the amount of alimony to be awarded, which we review for abuse of discretion." *Id.* "The trial court's decision constitutes an abuse of discretion where it 'is manifestly unsupported by reason, or so arbitrary that it could not have been the result of a reasoned decision[.]'" *Collins v. Collins*, 243 N.C. App. 696, 700, 778 S.E.2d 854, 856 (2015) (citation omitted). "An error of law is by definition an abuse of discretion." *Li v. Zhou*, 252 N.C. App. 22, 26, 797 S.E.2d 520, 523 (2017) (citations omitted).

This Court reviews a trial court's order containing findings of fact "to determine if there is competent evidence to support the trial court's findings of fact and whether the findings support the conclusions of law and ensuing judgment." *Klein v. Klein*, 290 N.C. App. 570, 577, 892 S.E.2d 894, 903 (2023) (quotation marks

and citation omitted). "The trial court's findings of fact are binding on appeal as long as competent evidence supports them, despite the existence of evidence to the contrary." *Id.* "[C]onclusions of law are reviewable de novo" on appeal. *Smith v. Smith*, 247 N.C. App. 166, 169, 785 S.E.2d 434, 437 (2016) (quotation marks and citations omitted). Furthermore, "[t]he labels 'findings of fact' and 'conclusions of law' employed by the trial court in a written order do not determine the nature of our review." *Walsh v. Jones*, 263 N.C. App. 582, 589, 824 S.E.2d 129, 134 (2019) (citation omitted). "If the trial court labels as a finding of fact what is in substance a conclusion of law, we review that 'finding' de novo." *Id.* (italics omitted).

## B. Law Governing Alimony

"'Alimony' means an order for payment for the support and maintenance of a spouse or former spouse, periodically or in a lump sum, for a specified or for an indefinite term, ordered in an action for divorce . . . or in an action for alimony without divorce." N.C. Gen. Stat. § 50-16.1A(1) (2022). "The court shall award alimony to the dependent spouse upon a finding that one spouse is a dependent spouse, that the other spouse is a supporting spouse, and that an award of alimony is equitable after considering all relevant factors, including those set out in [N.C. Gen. Stat. § 50-16.3A(b)]." *Id.* § 50-16.3A(a) (2022).

A dependent spouse is a spouse "who is actually substantially dependent upon the other spouse for his or her maintenance and support or is substantially in need of maintenance and support from the other spouse." *Id.* § 50-16.1A(2) (2022). A

supporting spouse is a spouse "upon whom the other spouse is actually substantially dependent for maintenance and support or from whom such spouse is substantially in need of maintenance and support." *Id.* § 50-16.1A(5) (2022). If the court finds that the supporting spouse participated in an act of illicit sexual behavior during the marriage and prior to or on the date of separation and that the dependent spouse did not, then the court shall order that alimony be paid to the dependent spouse. *Id.* § 50-16.3A(a).

In determining the amount, duration, and manner of payment of alimony, the trial court shall consider all relevant factors, including the following statutory factors:

> (1) The marital misconduct of either of the spouses . . . ;
>
> (2) The relative earnings and earning capacities of the spouses;
>
> (3) The ages and the physical, mental, and emotional conditions of the spouses;
>
> (4) The amount and sources of earned and unearned income of both spouses, including, but not limited to, earnings, dividends, and benefits such as medical, retirement, insurance, social security, or others;
>
> (5) The duration of the marriage;
>
> (6) The contribution by one spouse to the education, training, or increased earning power of the other spouse;
>
> (7) The extent to which the earning power, expenses, or financial obligations of a spouse will be affected by reason of serving as the custodian of a minor child;
>
> (8) The standard of living of the spouses established during the marriage;
>
> (9) The relative education of the spouses and the time necessary to acquire sufficient education or training to

enable the spouse seeking alimony to find employment to meet his or her reasonable economic needs;

(10) The relative assets and liabilities of the spouses and the relative debt service requirements of the spouses, including legal obligations of support;

(11) The property brought to the marriage by either spouse;

(12) The contribution of a spouse as homemaker;

(13) The relative needs of the spouses;

(14) The federal, State, and local tax ramifications of the alimony award;

(15) Any other factor relating to the economic circumstances of the parties that the court finds to be just and proper.

(16) The fact that income received by either party was previously considered by the court in determining the value of a marital or divisible asset in an equitable distribution of the parties' marital or divisible property.

*Id.* § 50-16.3A(b) (2022).

The trial court must make a specific finding of fact on each of these factors if evidence is offered on that factor. *Id.* § 50-16.3A(c) (2022). The trial court is not, however, required to make findings about the weight and credibility it gives to the evidence before it. *Robinson v. Robinson*, 210 N.C. App. 319, 327, 707 S.E.2d 785, 791 (2011). The trial court must "set forth the reasons for its award or denial of alimony and, if making an award, the reasons for its amount, duration, and manner of payment." N.C. Gen. Stat. § 50-16.3A(c). The trial court is to "exercise its discretion in determining the amount, duration, and manner of payment of alimony." *Id.* § 50-16.3A(b).

## C. Plaintiff's Arguments

The trial court determined that Plaintiff is a dependent spouse, Defendant is a supporting spouse, Defendant participated in an act of illicit behavior during the marriage and Plaintiff did not, and that an award of alimony to Plaintiff is equitable under the circumstances. The trial court awarded Plaintiff alimony in the amount of $2,513 for 120 months. Plaintiff's arguments before this Court pertain solely to the amount of alimony awarded.

### 1. Plaintiff's Income

Plaintiff first argues that the trial court erroneously calculated her actual income in the following three ways: (1) by disallowing $5,060 in labor expenses for Wingin' It; (2) by disallowing $13,399.73 in inventory expenses for Wingin' It; and (3) by finding that her annual income for Quest Academy employment was $22,000.

In determining an alimony award, the trial court must consider "[t]he relative earnings and earning capacities of the spouses[.]" N.C. Gen. Stat. § 50-16.3A(b)(2). "Alimony is ordinarily determined by a party's *actual* income, from all sources, at the time of the order." *Kowalick v. Kowalick*, 129 N.C. App. 781, 787, 501 S.E.2d 671, 675 (1998) (citation omitted). Yet, there are exceptions to this general rule. A trial court may impute income to a party if the trial court first finds that the party has depressed their income in bad faith. *Id.* "Bad faith for [a] dependent spouse means shirking the duty of self-support[.]" *Works v. Works*, 217 N.C. App. 345, 347, 719 S.E.2d 218, 219 (2011) (citations omitted). Bad faith may be proven "from evidence

that a spouse has refused to seek or to accept gainful employment; willfully refused to secure or take a job; deliberately not applied himself or herself to a business or employment; [or] intentionally depressed income to an artificial low." *Id.* (quotation marks and citations omitted). Additionally, this Court has allowed the trial court to use prior years' incomes to determine a party's current income in cases where the trial court found the evidence of actual income to be unreliable or otherwise insufficient. *See e.g., Diehl v. Diehl*, 177 N.C. App. 642, 649-50, 630 S.E.2d 25, 30 (2006); *Zurosky v. Shaffer*, 236 N.C. App. 219, 242-44, 763 S.E.2d 755, 769-70 (2014).

### a. *Labor and Inventory Expenses for Wingin' It*

Here, the trial court made the following findings of fact relevant to Plaintiff's arguments concerning the labor and inventory expenses:

> 32. Defendant also alleges that Plaintiff is underemployed and has the ability to earn substantially more than she currently earns.
>
> 33. Plaintiff has not attempted to find a fulltime job with benefits since the parties' date of separation. Plaintiff testified that she wants to focus on her butterfly business. Plaintiff testified that her butterfly business sales increased by $20,000 this year and expects her business to make more in the future. Plaintiff works an average of 15 hours a week on the butterfly business and has an employee that helps her with order fulfillments. Plaintiff explained that her business is seasonal and that she works substantially more hours during the Summer.
>
> 34. Plaintiff's 2021 income tax return reflects negative income from Wingin It, which is not consistent with prior years. Based on Plaintiff's testimony at trial, Wingin It operates at a 40% profit margin.
>
> 35. Plaintiff had the time and ability to perform

packaging/order fulfillment duties for Wingin It, yet she incurred an increasing and unnecessary expense for another person to perform such tasks for her. Plaintiff's Schedule C Part III of her personal tax return shows an annual cost of labor expense of $5,060 in 2021, $4,000 in 2020, $2,200 in 2019 and $0 in 2018.

36. Considering Plaintiff's work schedule, she could easily perform the duties that she pays another person to perform without affecting her business or her employment with Quest Academy thereby allowing her to save approximately $5,060 per year in labor costs.

37. Additionally, in 2021, contrary to her actions in other years, Plaintiff pre-ordered additional inventory (the sales of which will not occur or be reflected until 2022) and incurred an additional $13,399.73 expense which effectively lowered the income generated by the business. Plaintiff testified that she bought supplies early in anticipation of supply chain issues.

38. The Wingin It profit and loss statements from 2021 reflect $83,035 in sales and $64,246 in cost of goods (which includes $5,060 for the cost of labor and additional costs for three inventory orders) for a gross income of $18,789 before the Part II business expenses are deducted.

39. It is reasonable to infer from the statements of the Plaintiff and the history of the company prior to 2021, that as receivables from sales increase for the business, so should the income.

40. Further, the pre-order of supplies in the Fall of 2021 that were intended for sale in 2022 has caused the 2021 income to appear temporarily lower than it normally would. The expense incurred in 2021 should be recovered in 2022.

41. In determining Plaintiff's actual income from Wingin It, the unnecessary cost of labor expense should be added back when determining gross income. For the year 2021, this amount is $5,060.

42. Further, for the year 2021, the third supply order of $13,399.73 should be added back. Adding back the cost of

labor and third supply order will cause the gross income in Part I of Schedule C to be $37,248.73, which is 44.85% of gross receipts.

43. The Court then considered what, if any, of the Part II expenses to deduct from gross income. The Part II expenses duplicate some of the expenses listed on Plaintiff's Financial Affidavit as her household and personal expenses. To the extent duplicate expenses are included in Plaintiff's Part II Expenses, they are not considered when calculating Plaintiff's reasonable expenses included in her financial affidavit.

44. The Part II expenses on Plaintiff's 2021 income tax return total $19,404. It is appropriate to subtract the "Car and Truck" deduction of $476 from Plaintiff's business expenses and to also not consider it as a personal regular recurring monthly expense. Plaintiff no longer has a car payment for the Mini Cooper and the Mazda was purchased for the parties' adult child Lily who also shared in the purchase of that vehicle. This results in the total Part II expenses being $18,928.

45. For 2021, when considering the Part I gross income from Wingin It of $37,248.73 and the Part II expenses of $18,928, Wingin It income after business expenses is $18,320.73.

### i. Labor Expense

Plaintiff challenges the trial court's decision to add the $5,060 labor expense back into her Wingin' It income to determine her 2021 gross income. Although Plaintiff challenges findings of fact 35, 36, 41, and 45, Plaintiff's challenge is a legal argument that the trial court erred "by erroneously imputing income to her without the requisite finding of bad faith."

The trial court found that "Plaintiff has not attempted to find a fulltime job

with benefits since the parties' date of separation[,]" "Plaintiff had the time and ability to perform packaging/order fulfillment duties for Wingin' It, yet she incurred an increasing and unnecessary expense for another person to perform such tasks for her[,]" and that Plaintiff "could easily perform the duties that she pays another person to perform without affecting her business or employment . . . ." Accordingly, the trial court added "the unnecessary cost of labor expense" of $5,060 to her gross income for the year 2021.

The trial court's findings allude to evidence of bad faith and it is apparent that the trial court imputed income of $5,060 to Plaintiff for 2021. However, the trial court did not specifically find that Plaintiff depressed her income in bad faith. *See Kowalick*, 129 N.C. App. at 787, 501 S.E.2d at 675. Absent such a finding, the trial court's findings were not sufficient to support its imputation of $5,060 to Plaintiff's 2021 gross income.

### ii. Inventory Expense

Plaintiff next challenges the trial court's decision to add $13,399.73 back to her 2021 gross income to account for a pre-order of inventory in the Fall of 2021 for sale of items in 2022 in anticipation of supply chain issues. Although Plaintiff challenges findings of fact 37, 40, 42, and 45, this is again a legal argument that the trial court erred "by erroneously imputing income to her without the requisite finding of bad faith."

The trial court found that "in 2021, contrary to her actions in other years,

Plaintiff pre-ordered additional inventory (the sales of which will not occur or be reflected until 2022) and incurred an additional $13,399.73 expense which effectively lowered the income generated by the business." The trial court further found that this pre-order "has caused the 2021 income to appear temporarily lower than it normally would" and thus this "supply order of $13,399.73 should be added back" to her 2021 gross income.

Unlike the "unnecessary" cost of labor discussed above, the pre-order of supplies caused Plaintiff's income to appear "temporarily lower" than normal, indicating that Plaintiff's 2021 gross income as reported was an unreliable measure of her income for purposes of alimony. This case is similar in ways to *Diehl* and *Zurosky*.

In *Diehl*,[1] plaintiff "challenge[d] the trial court's use of an average of his monthly gross incomes in 2001 and 2002 as a basis for finding his monthly gross income for 2003 . . . ." 177 N.C. App. at 649, 630 S.E.2d at 30. We concluded that the trial court's findings of fact that the evidence of actual income was unreliable were supported by the evidence and held, "Given the unreliability of [plaintiff's] documentation, we cannot conclude . . . that the trial court abused its discretion by averaging . . . income from his . . . two prior tax returns to arrive at his 2003 income."

---

[1] Although *Diehl* involved the computation of plaintiff's income for purposes of child support, its reasoning has been applied in alimony cases. *See Zurosky*, 236 N.C. App. at 242-44, 763 S.E.2d at 769-70.

*Id.* at 650, 630 S.E.2d at 30. This Court also found plaintiff's characterization of the trial court's methodology of averaging prior years' incomes as "imputation" of income to be inaccurate and held that the law of imputation of income was inapplicable. *Id.* Thus, the trial court was not required to make a finding of bad faith. *Id.*

In *Zurosky*, this Court distinguished cases wherein the trial court imputed income to a party when that party acted in bad faith to depress their income from cases where a party's reported income was unreliable, explaining that in *Diehl*, "the trial court did not make a finding of bad faith or have evidence that the spouse deliberately depressed his income; the trial court used prior years' incomes because the trial court did not have sufficient evidence regarding his actual income." 236 N.C. App. at 243, 763 S.E.2d at 769. As in *Diehl*, there were concerns over the reliability of the reported income in *Zurosky*. Accordingly, we held that the trial court did not abuse its discretion in using prior years' income to determine actual income for purposes of computing alimony. *Id.* at 243-44, 763 S.E.2d at 770.

Here, as in *Diehl* and *Zurosky*, the trial court was concerned with the reliability of Plaintiff's reported income. The trial court found that "contrary to her actions in other years, Plaintiff had pre-ordered additional inventory" and that Plaintiff testified that she "bought supplies early in anticipation of supply chains issues." The trial court further found that this pre-order "caused the 2021 income to appear temporarily lower than it normally would." Thus, based on her past business decisions and the reason for pre-ordering inventory, her reported 2021 gross income

was not a reliable measure of her actual income. Unlike in *Diehl* and *Zurosky*, the reliability of Plaintiff's reported income was not attributable to Plaintiff's failure to provide sufficient or reliable documentation; in fact, her pre-order of inventory was potentially a wise business decision. Nonetheless, as in *Diehl* and *Zurosky*, the trial court's findings here support its decision to include the $13,399.73 cost of the inventory order in the calculation of Plaintiff's 2021 gross income.

### b. *Quest Academy Income*

Plaintiff next argues that the trial court erroneously found that her actual income from Quest Academy was $22,000 annually.

Finding of Fact 28 provides: "Plaintiff is currently employed in a contract part time position at Quest Academy where [she] works approximately 15 hours per week and earns $22,000 in annual income. Plaintiff anticipates signing a full year contract with Quest Academy in May 2022."

Plaintiff testified that she began working at Quest Academy in October of 2021. When asked how much she was paid for working three days a week at Quest Academy, Plaintiff responded, "I came in, sort of, at the middle of the year. Somebody quit, and they reached out to me and offered me a position. And so it's not for the full year, but I know that for the full year it would be $22,000 a year." When asked if she planned to continue working at that job, Plaintiff responded, "Yes, I do." The following exchange then took place between the trial court and Plaintiff:

> THE COURT: That's $22,000 a year if it's the full year?

[PLAINTIFF]: Yes.

THE COURT: Working three days a week?

[PLAINTIFF]: Uh-huh.

THE COURT: Okay. Thank you.

Plaintiff's testimony is competent evidence to support the challenged finding of fact that she earns $22,000 in annual income from Quest Academy.

Plaintiff argues that her Financial Affidavit, her 2021 Federal income tax return, and her Social Security Historical Statement of Income do not reflect that Plaintiff had received $22,000 in annual income from Quest Academy as stated in the above finding. However, Plaintiff did not work a full academic year in 2021 and had yet to work a full academic year as of the 14 March 2022 trial; accordingly, Plaintiff's 2021 tax return and 7 February 2022 Social Security Historical Statement of Income would not have reflected an annual income of $22,000 from Quest Academy.

As this challenged finding of fact is supported by competent record evidence, it is conclusive on appeal. *Klein*, 290 N.C. App. at 577, 892 S.E.2d at 903.

c. *Summary of Plaintiff's Income Discussion*

For the reasons stated above, we hold as follows: Absent a finding that Plaintiff acted in bad faith by incurring a $5,060 labor expense for Wingin' It, the trial court's findings were not sufficient to support its imputation of $5,060 to Plaintiff's 2021 gross income. However, the trial court's findings support its decision to include the $13,399.73 inventory expense in the calculation of Plaintiff's 2021 gross income for Wingin' It, and the evidence supports the trial court's finding that Plaintiff's annual

income from Quest Academy was $22,000. Accordingly, we vacate the Alimony Order and remand this matter to the trial court with instructions to determine whether Plaintiff depressed her income in bad faith. If the trial court finds so, it must make an explicit finding of bad faith. If it does not so find, the trial court must recalculate Defendant's monthly alimony obligation to Plaintiff without imputing the $5,060 in income to her.

### 2. *Standard of Living*

Plaintiff next argues that the trial court undervalued the parties' standard of living during the marriage, specifically challenging the trial court's findings that the parties lived in a frugal manner, and that the trial court erred by failing to allow Plaintiff expenses for a comparable dwelling and investment savings. Plaintiff thus argues that the trial court's failure to consider the parties' actual accustomed standard of living resulted in an insufficient alimony award.

"[T]he parties' needs and expenses for purposes of computing alimony should be measured in light of their accustomed standard of living during the marriage." *Barrett v. Barrett*, 140 N.C. App. 369, 372, 536 S.E.2d 642, 645 (2000); *see* N.C. Gen. Stat. § 50-16.3A(b)(8) (In determining alimony, the trial court shall consider "[t]he standard of living of the spouses established during the marriage[.]"). Our Supreme Court has made it clear that the "accustomed standard of living is based upon the parties' lifestyle during the marriage and not just economic survival":

> We think usage of the term accustomed standard of living

of the parties completes the contemplated legislative meaning of maintenance and support. The latter phrase clearly means more than a level of mere economic survival. Plainly, in our view, it contemplates the economic standard established by the marital partnership for the family unit during the years the marital contract was intact. It anticipates that alimony, to the extent it can possibly do so, shall sustain that standard of living for the dependent spouse to which the parties together became accustomed.

*Rea v. Rea*, 262 N.C. App. 421, 428, 822 S.E.2d 426, 432 (2018) (quoting *Williams v. Williams*, 299 N.C. 174, 181, 261 S.E.2d 849, 855 (1980)).

### a. *Frugal Manner of Living*

Plaintiff argues that the findings of fact and the evidence do not support the portions of findings of fact 11 and 81(g) that "the parties lived in a frugal manner." The trial court made the following relevant findings of fact:

> 11. Despite having the financial ability to live an extravagant lifestyle during their marriage, the parties lived in a frugal manner.
>
> 12. Around 2003, the parties purchased a lake house on Lake Gaston.
>
> 13. During the marriage, the parties took a vacation to Costa Rica when they were first married, went to Jamaica for their anniversary, visited Israel, and went to Disney World with their children. However, the majority of vacations they parties took during the marriage were spent at the lake house.
>
> . . . .
>
> 64. The parties lived in a 4300 square foot home during their marriage. Although owning a home would be consistent with the parties' accustomed standard of living during the marriage, Plaintiff failed to demonstrate any need for the purchase of a house.

. . . .

81. The Court gave due consideration to the factors outlined in N.C.G.S. § 50-16.3A(b) and finds that an award of alimony is equitable. The Court makes specific findings concerning those factors outlined in N.C.G.S. § 50-16.3A upon which evidence was received by the Court as follows:

. . . .

g. <u>Factor (b)(8)</u>: As more fully explained above, the parties had the ability to live an extravagant lifestyle during their marriage but lived in a frugal manner.

While "frugal" is a subjective term, it can be defined as "characterized by or reflecting economy in the use of resources" and implies an "absence of luxury and simplicity of lifestyle." Frugal, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/frugal (last visited May 23, 2024). Here, in addition to the challenged findings regarding the "frugal manner" in which the parties lived, the trial court made the following findings about their standard of living: the parties lived in a 4,300 square-foot home; the parties owned a second home at the lake where they vacationed; and the parties also vacationed in Costa Rica, Jamaica, Israel, and Disney World. The record evidence supports these findings of fact and the record evidence also indicates that at the time of separation, the parties had accumulated five vehicles–an Acura RLX, an Inifinti, a Mazda Miata, a Ford Escape, and a Mini Cooper–a pontoon boat, and two jet skis. While the findings regarding the parties' standard of living and the record evidence would not support a finding that the parties lived in an extravagant manner, they likewise do not support a finding that

the parties "lived in a frugal manner." We thus vacate the portions of findings 11 and 81(g) stating that the parties "lived in a frugal manner."

### b. *Comparable Dwelling*

Plaintiff next argues that the portion of the trial court's finding of fact 64 that states that "Plaintiff failed to demonstrate any need for the purchase of a house" is not supported by any evidence or law. Plaintiff argues that the trial court erred by relying on her apartment rent of $1,475, "which is significantly lower than the $4,697 mortgage the parties paid as part of their accustomed standard of living during the marriage[,]" in determining her reasonable monthly needs and expenses.

The parties accustomed standard of living "contemplates the economic standard established by the marital partnership" and anticipates that, where possible, alimony "shall sustain that standard of living for the dependent spouse to which the parties together became accustomed." *Rea*, 262 N.C. App. at 428, 822 S.E.2d at 432 (citation omitted).

The trial court made the following relevant findings of fact:

> 61. Plaintiff currently lives in an apartment where she has resided for two years. Plaintiff currently pays $1,475 to rent an apartment. Plaintiff recently renewed her lease for a third year in January 2022.
>
> 62. Although Plaintiff is currently renting an apartment, she desires to purchase a home where her mortgage would be approximately $2,200 per month.
>
> 63. Despite having the current financial resources to purchase a home, Plaintiff has not purchased a home due to the current state of the housing market.

64. The parties lived in a 4300 square foot home during their marriage. Although owning a home would be consistent with the parties' accustomed standard of living during the marriage, Plaintiff failed to demonstrate any need for the purchase of a house.

. . . .

81. . . .

. . . .

i. Factor (b)(l0): As a result of the Consent Order and Judgment for Equitable Distribution, Plaintiff was removed from liability on the home mortgage and lake cabin mortgage (which were awarded to the Defendant) . . . . Defendant has a combined monthly mortgage expense of $4,753.39. . . .

While a majority of these findings, including that "owning a home would be consistent with the parties' accustomed standard of living during the marriage," are supported by competent evidence, the portion of finding 64 that "Plaintiff failed to demonstrate any need for the purchase of a house" is not supported. The trial court must "consider the parties' accustomed standard of living during the marriage and not just [Plaintiff's] actual expenses at the time of trial." *Myers v. Myers*, 269 N.C. App. 237, 261, 837 S.E.2d 443, 460 (2020).

The trial court's supported findings regarding the parties accustomed standard of living during the marriage include the following: "The parties lived in a 4300 square foot home during their marriage" and "owning a home would be consistent with the parties' accustomed standard of living during the marriage[.]" Furthermore, finding of fact 81(i) indicates that Defendant continues to reside in the former-marital

home and lake home, making $4,753.39 in monthly mortgage payments.

Based upon these findings and the record evidence, Plaintiff's residence in a rental apartment for $1,475 monthly is a significant reduction in her standard of living from the standard established during the parties' marriage and from the standard Defendant continues to enjoy. Although the trial court made detailed findings of fact regarding what it found to be the parties' reasonable individual expenses, these findings appear to be based solely upon the evidence of expenses for each party at the time of trial without consideration of the parties' accustomed standard of living. *See id.* ("No findings indicate any difference between [Plaintiff's] *actual expenses* after separation as compared to the *accustomed standard of living* during the marriage . . . ."). When the trial court considers the parties' accustomed standard of living developed during the marriage, instead of Plaintiff's reduced standard of living after separation, her reasonable needs will be higher. While there is no requirement that Plaintiff enjoy the same lifestyle as Defendant's current lifestyle, the trial court must consider the accustomed standard of living developed by the parties during the marriage in determining Plaintiff's reasonable need for support. *Id.* at 261-62, 837 S.E.2d at 460.

Based upon the trial court's findings, this is not a case where the trial court limited the alimony award because Defendant lacked the ability to pay more alimony, nor was the alimony award reduced based upon any marital fault by Plaintiff—in fact, Defendant admitted marital fault in this case. We thus vacate the portion of

finding 64 stating that "Plaintiff failed to demonstrate any need for the purchase of a house."

### c. *Investment Savings*

Plaintiff next argues that the trial court erred by not including savings expenses for Plaintiff more consistent with the parties' accustomed standard of living. Plaintiff specifically argues that the trial court erred by narrowly focusing on "retirement savings" instead of considering various savings and investment accounts possessed by the parties and funded by their excess earnings.

"[T]he trial court can properly consider the parties' custom of making regular additions to savings plans as a part of their standard of living in determining the amount and duration of an alimony award . . . ." *Glass v. Glass*, 131 N.C. App. 784, 789-90, 509 S.E.2d 236, 239 (1998). However, the trial court may consider a savings component to an alimony award "only if the parties' had a habit of regularly contributing money to savings during their marriage." *Collins*, 243 N.C. App. at 707, 778 S.E.2d at 860 (citation omitted). *See Rhew v. Rhew*, 138 N.C. App. 467, 473, 531 S.E.2d 471, 475 (2000) ("Evidence was presented that established an historical pattern of such contributions, which satisfied the requirement in *Glass* that there be a custom of regular savings."). "Further, our case law establishes that the purpose of alimony is not to allow a party to accumulate savings." *Glass*, 131 N.C. App. at 790, 509 S.E.2d at 240.

Here, the trial court made the following challenged findings of fact:

70. There is insufficient evidence that the parties have established a pattern of saving for retirement as part of their accustomed standard of living during the marriage.

71. The financial affidavits of each party do not reflect any retirement contributions for their respective date of separation expenses. Further, the parties' personal tax returns that were admitted into evidence do not reflect a retirement contribution.

72. Therefore, the Court is not considering the $600 retirement expense on Plaintiff's financial affidavit.

Plaintiff argues that the trial court's finding of fact that she "was distributed $569,702 in *investment accounts* and a cash distributive award totaling $475,000 in addition to other cash, *bank accounts*, and *investments* in her name" and that "[w]hen combined with other *IRA and bank accounts*, Plaintiff had cash and *investments* of approximately $1,468,208 as of the date of trial" shows that "savings and investments were a part of the parties' standard of living during the marriage." While we agree that this finding shows an accumulation of money in various accounts, indicating that the parties saved money during the marriage, we are bound by case law that requires evidence of a regular pattern of savings. *See, e.g., Glass*, 131 N.C. App. at 789-90, 509 S.E.2d at 239; *Collins*, 243 N.C. App. at 707, 778 S.E.2d at 860. Plaintiff points to no evidence, and we can find none, to establish a regular pattern of savings contributions to satisfy the requirement in *Glass* that there be a custom of regular savings. Accordingly, the challenged findings of fact are binding upon us. *Klein*, 290 N.C. App. at 577, 892 S.E.2d at 903.

   d. *Summary of Standard of Living Discussion*

For the reasons stated above, we hold as follows: The portions of the trial court's findings of fact 11 and 81(g) stating that the parties "lived in a frugal manner" are not supported by the evidence and are vacated. The portion of finding of fact 64 stating that "Plaintiff failed to demonstrate any need for the purchase of a house" is not supported and is vacated. The trial court did not err by excluding savings expenses for Plaintiff. Accordingly, we vacate the Alimony Order and remand this matter to the trial court with instructions to determine Plaintiff's reasonable needs in light of the parties' accustomed standard of living and a new alimony order consistent with this determination.

### 3. *Differential Treatment*

Plaintiff next argues that "[t]he trial court manifestly abused its discretion by applying differential treatment to the parties when it determined the amount of alimony." Plaintiff's argument is essentially that the trial court awarded Plaintiff an insufficient amount of alimony in light of the parties' accustomed standard of living and disparate incomes. As we have addressed Plaintiff's arguments above and have determined that the trial court erred in various ways, we need not reiterate our analysis here.

### 4. *Marital Misconduct*

Plaintiff finally argues that the trial court erred by failing to find and conclude that Defendant engaged in marital misconduct other than Defendant's admitted illicit sexual behavior. Plaintiff points to evidence of alcohol and drug use by

Defendant and of controlling and cruel conduct by Defendant.

"In determining the amount, duration, and manner of payment of alimony, the court shall consider all relevant factors, including . . . [t]he marital misconduct of either of the spouses." N.C. Gen. Stat. § 50-16.3A(b)(1).

> "Marital misconduct" means any of the following acts that occur during the marriage and prior to or on the date of separation:
>
> > . . . .
> >
> > f. Indignities rendering the condition of the other spouse intolerable and life burdensome;
> >
> > . . . .
> >
> > h. Excessive use of alcohol or drugs so as to render the condition of the other spouse intolerable and life burdensome[.]

*Id*. § 50-16.1A(3) (2022).

In addition to finding that "Defendant now admits that he had a sexual relationship with Jill O'Kane during the parties' marriage prior to their separation[,]" the trial court found that "[d]uring the marriage, Defendant would often come home impaired from alcohol and marijuana after attended hockey games." Although the trial court did not make findings of fact regarding Defendant's alleged controlling and cruel behavior, "[t]he court is not required to make findings about the weight and credibility which it gives to the evidence before it." *Robinson*, 210 N.C. App. at 327, 707 S.E.2d at 791. Furthermore, the trial court is not required to include findings of each piece of evidence presented at trial and is instead, only required to "resolve the material, disputed factual issues raised by the evidence." *Carpenter v. Carpenter*, 225 N.C. App.

269, 273, 737 S.E.2d 783, 787 (2013). Accordingly, the trial court was not required to make additional findings of fact about alleged misconduct by Defendant in awarding alimony to Plaintiff.

## III. Conclusion

For the reasons stated herein, we vacate the Alimony Order and remand the matter to the trial court with the following instructions: (1) Determine whether Plaintiff depressed her income in bad faith by incurring a $5,060 labor expense for Wingin' It. If the trial court finds so, it must make an explicit finding of bad faith. If it does not so find, the trial court must recalculate Defendant's monthly alimony obligation to Plaintiff without imputing the $5,060 in income to her. (2) Vacate findings of fact 11 and 81(g) stating that the parties "lived in a frugal manner." (3) Vacate the portion of finding of fact 64 stating that "Plaintiff failed to demonstrate any need for the purchase of a house." (4) Determine Plaintiff's reasonable needs and expenses in light of the parties' accustomed standard of living during the marriage— not just Plaintiff's actual expenses at the time of trial—and recalculate Defendant's monthly alimony obligation to Plaintiff based on this determination. (5) Enter a new order for alimony.

VACATED AND REMANDED.

Judges WOOD and GORE concur.